**HOT WAX, INC., Plaintiff,**

v.

**WARSAW CHEMICAL COMPANY, INC., Defendant.**

**No. 97 C 6885.**

United States District Court,
N.D. Illinois,
Eastern Division.

March 16, 1999.

Stephen Theodore Grossmark, John Peter Maniatis, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for plaintiff.

Timothy M. McCarthy, James Leo McKnight, Nancy Rundin Daugherty, Law Office of Raymond C. Persin, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

COAR, District Judge.

Before this court are Defendant Warsaw Chemical Company, Inc.'s ("Defendant" or "Warsaw") cross-motion for summary judgment and Plaintiff Hot Wax, Inc.'s ("Plaintiff" or "Hot Wax") cross-motion for

partial summary judgment as to liability on Plaintiff's complaint, which alleges that Defendant engaged in false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Also before this court are Plaintiff's motions to strike portions of the Affidavit of Kenneth E. Bucher ("Bucher") and testimony of Jeffrey Rufner ("Rufner"). For the following reasons, Defendant's and Plaintiff's cross-motions for summary judgment are both DE-NIED. Plaintiff's motion to strike portions of Bucher's Affidavit is GRANTED. Plaintiff's motion to strike portions of Rufner's testimony is GRANTED IN PART and DENIED IN PART. Plaintiff's claims for acts that occurred prior to October 1, 1994 are barred.

## I. Plaintiff's Motions to Strike

As discussed in detail in the fact section of this opinion, a question at the heart of Plaintiff's false advertising claim is whether the products distributed by Defendant and labeled as "wax" actually contain wax. Plaintiff has moved to strike certain statements by Bucher and Rufner regarding the content of seven of Defendant's product.

## A. Bucher Affidavit

■ Paragraph 6 of Bucher's Affidavit states that the following Warsaw products contain wax: Formula 503 Wax & Shine Cherry/Lemon Scent; Formula 500 Lemon Foam Wax; Formula 523 Process 2 Sealer Wax; Formula 530 LW Lemon Wax & Shine; Formula 530 SW Sealer Wax; Formula 527 Clear Coat Protectant; and Formula 530 CCP Color Coat Protectant. Plaintiff has moved to strike this statement on two grounds: that Bucher does not have personal knowledge of the chemical composition of the products at issue in this case and that Bucher's information regarding the alleged presence of wax in these particular products is based on the hearsay statements of Rufner and of Witco Chemical Co. ("Witco"). Because the court agrees that Bucher has no personal knowledge of the chemical composi-

tion of the products at issue in this case, the court GRANTS Plaintiff's motion to strike ¶ 6 of Bucher's Affidavit.

While Bucher stated in his affidavit that he has "personal knowledge of all statements made in this Affidavit," (Bucher Aff. ¶ 3), this claim is belied by his deposition testimony and by Defendant's 12(N) Response ¶¶ 11–12. In his deposition testimony, Bucher admitted both that he did not know the chemical composition of the Warsaw products, (Bucher Dep. at 16), and that his belief that any of the Warsaw products contained wax was based solely on the data sheets of Warsaw's chemical supplier, Witco, and on the statements of Rufner, though Bucher did not know how Rufner determined that wax was present in any of the products. (Bucher Dep. at 21 (Witco) and 111–12 (Rufner).) In its 12(N) Response, Defendant expressly agreed with Plaintiff's 12(M) Statement ¶¶ 10 ("Kenneth Bucher, in his Affidavit which is attached to Warsaw's Motion for Summary Judgment, states that he has personal knowledge that seven of the Warsaw products at issue contain wax."), 11 ("Kenneth Bucher does not know the chemical composition of these products."), and 12 ("The basis of Kenneth Bucher's knowledge referred to in Paragraphs 3 and 6 of his affidavit is entirely dependent upon what he has been told by Witco Chemical Co. ('Witco'), a chemical supplier (Ex. A at 21), and Jeffrey Rufner, Warsaw's chemist in its car wash division.").

■ The court finds that ¶ 6 of Bucher's Affidavit is inadmissible. "Only evidence that would be admissible at trial is properly considered either in support of or in opposition to a motion for summary judgment." *Servpro Industries, Inc. v. Schmidt,* 1997 WL 158316, *21 (N.D.Ill. 1997) (citing Fed.R.Civ.P. 56(e) and *Pfeil v. Rogers,* 757 F.2d 850, 860 (7th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986)). The general rule regarding admissibility of affidavits at summary judgment is that the affiant, like any witness in a case other than an expert

witness, must only testify to matters within his personal knowledge. *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995). Additionally, where a witness's affidavit contradicts the witness's sworn deposition, the affidavit will be disregarded. *Id.* at 68 ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy."). *See also McCarthy v. Kemper Life Insurance Companies*, 924 F.2d 683, 687 (7th Cir. 1991) (A party "cannot effectively oppose a motion for summary judgment by contradicting his own deposition testimony."). It is undisputed that Bucher has no personal knowledge regarding the chemical composition of the products at issue in this case. In light of that fact, ¶ 6 of his affidavit is inadmissible under Rule 56.

The court also finds that Bucher's statements rely on inadmissible hearsay. Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Paragraph 6 of Bucher's affidavit, in essence, is a repetition of Witco's and Rufner's out-of-court statements regarding the alleged presence of wax in the products at issue. Bucher repeats these out-of-court statements as though they were facts, and Defendant attempts to use Bucher's repetition for the truth of the matter asserted, i.e., that the products at issue do, in fact, contain wax. Accordingly, Plaintiff's Motion to Strike ¶ 6 of Bucher's Affidavit is GRANTED.

**B. Rufner Testimony**

■ Plaintiff argues that Rufner's expert testimony as to the presence of carnauba wax in certain of Warsaw's products should be stricken because it is based on inadmissible and unreliable hearsay statements by Wilco employees. The standard for admissibility of expert testimony is found in Federal Rule of Evidence 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Witco's Carnauba Spray 200 is used in the manufacturing of the Warsaw products at issue in this case. (Ptf's 12(M) Stmt. ¶¶ 14–15.) Rufner's testimony is that the Carnauba Spray 200 contains carnauba wax and, thus, that the Warsaw products at issue in this case contain carnauba wax. Defendant's claim and Rufner's opinion that the Warsaw products contain carnauba wax is entirely dependent on the claim that the Carnauba Spray 200 contains carnauba wax. (Ptf's 12(M) Stmt. ¶ 15.) Rufner's opinion that the Carnauba Spray 200 contains carnauba wax is based on two types of evidence: (1) statements from Witco that Carnauba Spray 200 contains carnauba wax and (2) solid clumps appear in the Carnauba Spray 200 product, and Rufner assumes that the solid clumps are carnauba wax.

The court finds that Rufner's opinion is inadmissible. Rufner assumes that the Carnauba Spray 200 product contains carnauba wax simply on the basis of hearsay statements by unnamed persons at Witco. (Rufner Dep. at 70) ("Q. [F]irst off, how do you know that's [the clumps seen in the Carnauba Spray 200 product] carnauba wax. A. It's my understanding from my discussions with Witco that Carnauba Wax 200 is Carspray 300 or a similar, very similar molecule, and the carnauba wax. Since I can put a drum of Carspray 300 out in the open, as cold as it wants to be and see no solids, I assume that any solids in the Carnauba Spray 200 are going to be

the carnauba wax.").[1]  Rufner has never been asked to conduct an analysis to verify the presence of carnauba wax in Carnauba Spray 200 or in the Warsaw products (Rufner Dep. at 19); his only testimony was that he has seen solid clumps in the Carnauba Spray 200 and has to keep the Carnauba Spray 200 heated to reduce clumping (Rufner Dep. at 19, 21). Rufner testified that the proper way to test for the presence of wax in a product would be to freeze the product and attempt to separate out the wax molecules from the rest of the product, including any other solids that may be present in the product. (Rufner Dep. at 20–21.)  While Rufner testified that the products at issue in this case do come out of suspension when frozen, (Rufner Dep. at 20–21), Rufner did not testify that he has ever separated out the solids or otherwise tested chemically for the presence of carnauba wax.

Rufner's opinion testimony is inadmissible under Rule 703.  While it is true that Rule 703 "is explicit that the materials on which an expert witness bases an opinion need not be admissible, let alone admitted, in evidence, provided that they are the sort of thing on which a reasonable expert draws in formulating a professional opinion," *Peabody Coal Co. v. Director, Office of Workers' Compensation Programs,* 165 F.3d 1126, 1128 (7th Cir.1999), this court has a duty "to make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence." *In re James Wilson Assoc.,* 965 F.2d 160, 172 (7th Cir.1992).  Rufner's testimony as to why he thought that Carnauba Spray 200 contained carnauba wax is premised entirely on out-of-court statements from unnamed Witco employees who stated that Carnauba Spray 200 contained carnauba wax.  While Rufner can state that he has first-hand knowledge that solid clumps form in Carnauba Spray 200 at certain temperatures, he has no first-hand knowledge of what those clumps chemically are. Additionally, he has no tests, etc., performed by himself or other experts analyzing the clumps in those products. Thus, Rufner's "expert testimony" is, in reality, hearsay statements from Witco's employees dressed up to look like expert testimony.  As such, it is inadmissible. *Cummins v. Lyle Indus.,* 93 F.3d 362, 372 (7th Cir.1996) (affirming district court determination that expert testimony was inadmissible where that testimony was based on "information from unidentified individuals on unspecified dates"; "There is no indication in the record that experts in Dr. Carpenter's field reasonably rely on statements of this kind."); *James Wilson Assoc.,* 965 F.2d at 173 (rejecting expert testimony where the expert simply testified "for the purpose of vouching for the truth of what the engineer had told him— of becoming in short the engineer's spokesman"); *Gong v. Hirsch,* 913 F.2d 1269, 1272–73 (7th Cir.1990) (rejecting expert testimony where the "information sought to be relied on … is merely a conclusory statement, made by a doctor who was not the treating physician at the time of the illness in question….").[2]

Even if Rufner's testimony was admitted, it would be entitled to little, if any, weight.  By its own terms, this testimony is lacking in scientific merit.  As Rufner himself testified, to determine the existence of wax in a product, one would have to freeze the product, separate the solids from the other parts of the product, and then separate the different solids from each other in order to attempt to isolate

---

**1.**  Rufner's testimony can be summarized as follows:  (1) Rufner has been told by Witco that Car Spray 200 = Car Spray 300 + carnauba;  (2) Car Spray 200 has clumps in it at certain temperatures that Car Spray 300 does not have;  (3) therefore, Rufner assumes (without conducting any tests) that the clumps in Car Spray 200 are carnauba wax.

**2.**  Additionally, Rufner testified that the people that he spoke to at Witco were not forthcoming with information.  The Carnauba Spray 200 product is listed as containing between 1%—10% carnauba wax;  Rufner has asked Witco repeatedly to give him a more specific percentage, but Witco has consistently refused.  (Rufner Dep. at 24.)

any wax molecules. There is no evidence that Rufner did this. Rather, Rufner just assumed that any solids in the Carnauba Spray 200 were carnauba. No reasonable jury could find on the basis of Rufner's testimony that Carnauba Spray 200 or the Warsaw products at issue in this case contain carnauba. Plaintiff's motion to strike Rufner's testimony as to the presence of carnauba wax in Carnauba Spray 200 or the subject products is GRANTED.

■ Plaintiff has also objected to a second portion of Rufner's opinion. Rufner opined in his report, dated October 30, 1998, that "[t]he purpose of alkoxylating wax is to ensure that it will go into solution in water more easily. It is very difficult to get more than trace amounts of wax into water. By purchasing alkoxylating wax, we can get more wax into solution," (Rufner Aff. ¶ 9), and that "[i]f wax is still alkoxylated, it is still wax. When wax is alkoxylated, it is still a low-melting organic mixture or compound of high molecular weight, solid at room temperature." (Rufner Aff. ¶ 10.) Plaintiff objects to ¶ 9 (that the purpose of alkoxylating wax is to cause it to go into solution in water more easily) because that opinion is based on discussions with unnamed Witco employees who told him that the alkoxylation was done "to make it [the wax] go in the solution easier." (Rufner 11/11/98 Dep. at 17.) As discussed above, the court finds that an expert opinion based on such unreliable, hearsay statements is inadmissible. However, in his affidavit, Rufner stated: "I relied on my review of the report of Metuchen Analytical Kendal Infrared, including analysis of spectra, my education, experience, and training, and my experience at Warsaw Chemical Company informing these opinions." (Rufner Aff. ¶ 11.) Given this statement, this court cannot find that Rufner's opinion from his Affidavit ¶ 9 is based solely on inadmissible, unreliable hearsay. Accordingly, Plaintiff's motion to strike Rufner's testimony is DENIED as to Rufner Affidavit, ¶ 9. The court notes that Plaintiff has not moved to strike Rufner's Affidavit as to any other opinion, including the alkoxylation opinion in ¶ 10.

## II. Facts

Plaintiff is a Wisconsin corporation with its principal place of business located in Racine County, Wisconsin. (Ptf's 12(M) Stmt. ¶ 2.) Defendant is an Indiana corporation with its principal place of business located in Warsaw, Indiana and which conducts business in the Northern District of Illinois. (Ptf's 12(M) Stmt. ¶ 3.) Defendant manufactures certain car care products intended to be used at car washes. (Ptf's 12(M) Stmt. ¶ 3.)

### A. The products

Defendant manufactures the following products: Formula 503 Wax & Shine Cherry/Lemon Scent; Formula 500 Lemon Foam Wax; Foam 522 Clear Coat Conditioner; Formula 537 Tri–Color Clear Coat Foam Conditioner; Formula 523 Process 2 Sealer Wax; Formula 527 Clear Coat Protectant; Formula 530 LW Lemon Wax & Shine; Formula SW Sealer Wax; Formula 530 CCP Clear Coat Protectant; Formula 533 Vanilla Foam Clear Coat Protectant (collectively, "subject products").

Defendant's sole grounds for calling the subject products "wax" is that they contain Witco's Carnauba Spray 200. (Ptf's 12(M) Stmt. ¶ 14.) Outside of what Bucher and Rufner were told by Witco, they never ascertained whether Carnauba Spray 200 actually contains carnauba wax. (Ptf's 12(M) Stmt. ¶¶ 12, 16.) Witco advertises Carnauba Spray 200 as a "drying aid" or "rinse aid" and states that it, as well as other Witco products, are "specially-designed cationic surfectants and blends which function as 'rinse aids' in the carwash industry. They accelerate the drying process and develop a shine by creating a hydrophobic surface on the vehicle." (Ptf's 12(M) Stmt. ¶ 19.) A "drying aid" is not a wax. (Ptf's 12(M) Stmt. ¶ 20.) Witco states that "[d]rying aids are often referred to generically as 'cheater waxes.' A

cheater wax is a product which imparts one or more of the characteristics of wax to an automobile without actually containing wax." (Ptf's 12(M) Stmt. ¶ 21.) In its "Technical Data" sheet for Carnauba Spray 200, Witco describes the product as a "concentrated blend of derivatized Carnauba wax, cationic emulsifier and coupler." (Ptf's 12(M) Stmt. ¶ 22.) A derivative is created when one either adds to or takes away part of a chemical's molecular structure to change its properties. (Ptf's 12(M) Stmt. ¶ 24.) In the Material Safety Data Sheet for Carnauba Spray 200, Witco claims that Carnauba Spray 200 contains 1–10% "Carnauba Wax, alkoxylated." (Ptf's 12(M) Stmt. ¶ 25.) The chemical process of alkoxylation adds molecules to the carnauba wax molecules, thus changing its physical characteristics. (Ptf's 12(M) Stmt. ¶ 26.) The physical characteristics of wax, according to the definition of wax accepted by both parties in this case, include a low melting organic mixture or compound of high molecular weight which is a solid at room temperature. (Ptf's 12(M) Stmt. ¶ 27.) Rufner stated that wax is alkoxylated to cause it to go into solution with water more easily. (Dft's 12(N) Stmt. ¶ 6; Rufner Aff. ¶ 9.) Rufner stated that alkoxylated wax is still wax because it remains "a low-melting organic mixture or compound of high molecular weight, solid at room temperature." (Dft's 12(N) Stmt. ¶ 7; Rufner Aff. ¶ 10.) Plaintiff's expert J. Stephen Doerr disagrees with Rufner and

states that alkoxylation changes both the carnauba wax compound and the characteristics of the carnauba wax compound, including its melting point. (Ptf's 12(M) Stmt. ¶ 28; Ptf's Ex. G (Doerr Aff.).)[3]

Defendant contends that it may properly call the subject products "wax" if wax actually gets on the surface of a car to which they are applied. (Ptf's 12(M) Stmt. ¶ 29.) Defendant also contends that carnauba wax covers the surface of the vehicle after the use of any of the subject products. (Ptf's 12(M) Stmt. ¶ 30; Ptf's Ex. A (Bucher Dep. at 74–75).) Defendant has not conducted tests or studies to determine how much, if any, carnauba wax is actually being applied by the subject products. (Ptf's 12(M) Stmt. ¶ 31.) Defendant has not conducted tests to determine how much protection is provided offered by any of the subject products labeled as a "wax." (Ptf's 12(M) Stmt. ¶ 32; Ptf's Ex. A (Bucher Dep. at 76).)[4] Bucher's reason for his belief that carnauba wax is actually covering the entire surface of a vehicle after the subject products are applied is because "it's in the formulation." (Ptf's 12(M) Stmt. ¶ 33.)

Using the percentage of ingredients listed on the subject products' formulation sheets and Witco's 1–10% figure for the amount of alkoxylated carnauba wax in the subject products, Rufner created the following estimates:

---

3. Defendant states that Duerr's affidavit, dated October 1998, was not previously produced during discovery and was not part of his expert report, which was due by court order on July 31, 1998. (Dft's 12(M) Resp. ¶ 28.) Defendant, however, does not argue that Duerr's affidavit should be struck, nor does Duerr include any case law or argument challenging the admission of the affidavit. The court is left uncertain as to whether Duerr's affidavit is a rebuttal opinion or an original opinion. The court will not strike the affidavit at this time. Defendant remains free to challenge the admissibility of Duerr's alkoxylation opinions at trial.

4. Defendant challenges Plaintiff's 12(M) Statement ¶ 32 on the grounds that Bucher did, in fact, state that a test was done. (Dft's 12(N) Resp. ¶ 32.) Bucher's deposition states:

Q. Has Warsaw ever done any testing to determine the amount of protection offered by the subject products which it claims are wax?
A. I guess the answer to that is no
Q. Okay.
A. We did testing to one of the products that you have on your list, but we don't claim it to be a wax.

(Ptf's Ex. A at 76.) The court has altered ¶ 32 to accord with the evidence.

| Product | % Alk. Carnauba wax | Dilution with water |
|---|---|---|
| 500 Lemon Foam Wax | 0.01—1.0% | 64 gallons:1 |
| 503 Wax & Shine (pre–1989) | 0% | n/a |
| 503 Wax & Shine (1989–94) | 0.2% | 64–80 gal:1 |
| 503 Wax & Shine (1994–) | 0.1% | 64–80 gal:1 |
| 522 Clean Coat Conditioner | 0.05%—0.5% | 80–100 gal:1 |
| 523 Process 3 (pre–1994) | 0.045%—0.45% | 80–100 gal:1 |
| 523 Process 3 (after 1994) | 0.13%—1.3% | 80–104 gal:1 |
| 527 CCP | 0.04—0.4% | 5–25 gal:1, then 64–80 gal:1 |
| 530 SW | 0.005—0.05% | 5–25 gal:1, then 64–80 gal:1 |
| 530 LW | 0.005—0.05% | 5–25 gal:1, then 64–80 gal:1 |
| 530 CCP | 0.09%—0.9% | 5–25 gal:1, then 80–100 gal:1 |
| 533 Vanilla Foam CCP | none | n/a |
| 537 Tri–Color CC Foam Cond. | none | n/a |

(Ptf's 12(M) Stmt. ¶ 34.) Warsaw has never undertaken any studies to determine how much, if any, carnauba wax is being applied with any of the subject products. (Ptf's 12(M) Stmt. ¶ 42.) Rufner testified that the only study he has conducted on the subject products was to attempt to measure the effect of silicones added to the products, not for the presence of wax. (Ptf's 12(M) Stmt. ¶ 43.) Silicone is not a wax. (Ptf's 12(M) Stmt. ¶ 48.) Victor Gamble, Rufner's superior, testified that, if the adhering substance was not a silicone or an oil, he has "always questioned how much ever stays on the surface of the car." (Ptf's 12(M) Stmt. ¶ 45.)

Prior to 1989, Formula 503 contained no wax. (Ptf's 12(M) Stmt. ¶ 37.)[5] The pre–1989 Formula 503 could properly be referred to as "cheater wax." (Ptf's 12(M) Stmt. ¶ 38.) Formulas 533 and 537 contain no wax in their present formulation. (Ptf's 12(M) Stmt. ¶ 39.)

Dr. J. Stephen Duerr ("Duerr"), a licensed chemist with a Ph.D. degree from the Massachusetts Institute of Technology, offered an expert report on behalf of Plaintiff. (Ptf's 12(M) Stmt. ¶ 7; see Ptf's Ex. C.) Duerr removed the volatile materials, i.e., the ones that evaporate, from the subject products. (Ptf's 12(M) Stmt. ¶ 7.) Duerr then analyzed the remaining non-volatile materials using infrared spectroscopy analysis to determine if any wax was present in the subject products. (Ptf's 12(M) Stmt. ¶ 7.) Based upon the results of these tests and his analysis of the Warsaw formulas, Duerr opined that there is no wax in any of the subject products. (Ptf's 12(M) Stmt. ¶ 7.) Defendant challenges Duerr's opinion on the grounds that Duerr did not perform any separation of the non-volatile portion of the products that he tested; according to Rufner, other nonvolatile materials in the products could interfere with or mask the spectra of carnauba wax. (Dft's 12(N) Stmt. ¶ 1; Rufner Aff. ¶¶ 6–7.)

Arthur Keller, who worked for S.C. Johnson Wax for over 30 years and developed wax products and rinse aid products for the automated car wash industry, has provided an expert report on behalf of Plaintiff. (Ptf's 12(M) Stmt. ¶ 8; see Ptf's Ex. D.) Keller reviewed the formula sheets and Technical Data Sheets disclosed by Warsaw in this case. (Ptf's 12(M) Stmt. ¶ 8.) Keller opined that the subject products are more appropriately classified as rinse aids and should not be called wax products because they do not contain any wax. (Ptf's 12(M) Stmt. ¶ 8.) Keller also opined that it was not feasible to substantiate any benefit from the subject products

5. While Defendant admits the allegations regarding the pre–1989 formulas, Defendant raises a statute of limitations objections. The court will consider the statute of limitations objections as part of its analysis.

at the dilution ratios involved, other than cleaning a vehicle's surface. (Ptf's 12(M) Stmt. ¶ 35.) Specifically, Keller opined that any added shine or protection from the subject products, at the dilution ratios involved, could at best be described as "negligible." (Ptf's 12(M) Stmt. ¶ 36.)[6]

## B. The advertising

Defendant advertises in trade magazines and at regional and national trade shows. (Ptf's 12(M) Stmt. ¶ 4.) Defendant offers point of purchase advertising, such as banners with its logo and brochures, to car wash owners or operators. (Ptf's 12(M) Stmt. ¶ 5.) Some of the statements and claims made by Warsaw in the advertising of its subject products include:

a. the claim that Formula 503 is "Not a cheater wax. Contains natural wax," and is a "Highly concentrated top quality liquid spray wax." Formula 503 is also described as "packed full of true, natural carnauba wax, providing the tough protective coating and bright gloss that your customers demand and expect." (Ptf's 12(M) Stmt. ¶ 6(1).)

b. the claim that Formula 500 is a "unique spray wax" which "[c]reates rapid water shedding" and "leaves [a] sparkling shine" and is a "lemon-scented foam wax." (Ptf's 12(M) Stmt. ¶ 6(2).)

c. the claim that Formula 522 is a "Polish Wax" which protects a car's "finish from harmful sun rays, acid rain, and winter salts." (Ptf's 12(M) Stmt. ¶ 6(3).) Advertising from 1990 stated that "Formula 522 polish wax is fortified with natural waxes and silicones. This pink foaming wax delivers a shine as well as a lasting protective coating." (Ptf's 12(N) Stmt. ¶ 4.)

d. the claim that Formula 537 provides "a long lasting gloss appearance and protective coating" and protects a car's "finish from harmful sun rays, acid rain, and winter salts." (Ptf's 12(M) Stmt. ¶ 6(4).)

e. the claim that Formula 523 is formulated with "a combination of silicones and carnauba wax for outstanding shine and protection" and is an "[e]xcellent hot wax" which provides a "[h]ard, durable finish" and "seals in proven wax protection." The advertising also states that Formula 523 "evenly deposits a second layer of wax protection to seal in a brilliant shine and hard durable finish." (Ptf's 12(M) Stmt. ¶ 6(5).) Bucher testified that the first layer of wax protection was presumably to be provided by Formula 522. (Ptf's 12(N) Stmt. ¶ 1.)

f. the claim that Formula 527 is "[f]ormulated with a unique blend of aminofunctional silicones and natural waxes," "provides a visible high gloss appearance and protective coating which lasts up to 30 days," and "[l]eaves [a] vehicle finish with that hand polished look and feel!" The advertising describes the finish as "so smooth your clients will swear it was hand waxed" or "paste wax." (Ptf's 12(M) Stmt. ¶ 6(6).)

g. the claim that Formula 530 LW and Formula 530 SW are "[f]ormulated with carnauba wax for outstanding shine and protection" and provide a "[h]ard, durable finish" and "seals in proven wax protection." (Ptf's 12(M) Stmt. ¶ 6(7).)

h. the claim that Formula 530 CCP is "[f]ormulated with a unique blend of aminofunctional silicones and natural waxes." (Ptf's 12(M) Stmt. ¶ 6(8).)

---

**6.** Defendant objects to Plaintiff's 12(M) Stmt. ¶¶ 35–36 on the grounds that "the defendant's products are tested under field conditions and the products perform as claimed." (Dft's 12(M) Resp. ¶¶ 35–36.) Defendant's basis for this claim is Bucher's deposition, where he described how Defendant has distributors use samples and give Defendant their opinions on the samples. (Bucher Dep. at 98–99.) While these subjective opinions may be relevant, they do not dispute the fact that Keller has the opinions that he offers in his report.

i. the claim that Formula 537 "provides the ultimate in shine and protection" and "[l]eaves a visible high gloss appearance and protective coating that lasts up to 30 days." (Ptf's 12(M) Stmt. ¶ 6(9).)

j. the claims that Formula 533 provides "the ultimate in shine and protection," and (Ptf's 12(M) Stmt. ¶ 6(10)), and "[p]rotects vehicle finish from harmful sunrays, acid rain, and winter salts." (Ptf's 12(N) Stmt. ¶ 6.) Defendant's current product guide states that Formula 533 is a "unique oil-free foaming clear coat protectant which provides the ultimate in shine and protection." (Ptf's 12(N) Stmt. ¶ 7.)

Regarding the advertisement for Formula 503 which states that Formula 503 "is packed full of true, natural carnauba wax," Bucher agrees that "the advertising guy made [sic] a little overboard with his statement." (Ptf's 12(M) Stmt. ¶ 40.) Rufner also agrees that the a formulation change that occurred after that advertisement for Formula 503 was run actually decreased the amount of estimated carnauba wax in the formula. (Ptf's 12(M) Stmt. ¶ 40.) Warsaw has never conducted any testing to substantiate whether Formula 523 leaves a hard and durable finish, like its advertising claim it does and like wax would leave. (Ptf's 12(M) Stmt. ¶ 47.)

When asked why he formulated the products with any alkoxylated carnauba wax at all, Rufner responded that, while he hoped to see some effect from the alkoxylated carnauba wax, he also wanted to justify Warsaw being able to state in its literature that its products contain carnauba because that term adds "some prestige" to the product. (Ptf's 12(M) Stmt. ¶ 41.) When asked why the subject products are not referred to in their names as silicone, Rufner stated: "I refer to anything with or without wax that I'm going to put in that [second to last car wash] cycle as wax just because it is an abbreviation, whether it contains wax or not, for that cycle." (Ptf's 12(M) Stmt. ¶ 49.)

Defendant sells its products through distributors. (Dft's 12(N) Stmt. ¶ 8.) Defendant does not sell its products directly to consumers. (Dft's 12(N) Stmt. ¶ 8.) Defendant notes that its point of purchase banners do not mention the word "wax." (Dft's 12(N) Resp. ¶ 5.) Plaintiff has enclosed a consumer research survey conducted by Pamela Narins ("Narins"); the consumers surveyed had purchased wax treatments at an automatic carwash within the six weeks prior to the survey. (Ptf's Ex. F (Narins) survey.) Customers driving their vehicles to a car wash who pay extra to have "wax" products applied to their vehicles expect there to be wax on their vehicle when they leave the car wash. (Ptf's 12(M) Stmt. ¶ 51.) The same consumers expect "wax" products to provide wax-like characteristics, including protecting the car, shining the car, repelling water, covering scratches, and inhibiting rust. (Ptf's 12(M) Stmt. ¶ 51; Ptf's Ex. F (Narins survey).) Narins opined that the typical consumer of such "wax" products "conclusively believe that the product they are buying is not only wax, but provides the benefits of wax, to their cars." (Ptf's Ex. F (Narins survey).)

### III. Summary judgment standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Cox v. Acme Health Serv., Inc.,* 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing that there is no

genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552–53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56. *Proviso Association of Retarded Citizens v. Village of Westchester,* 914 F.Supp. 1555, 1560 (N.D.Ill.1996); *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Ind.) Pension Fund v. Kelly,* 1996 WL 507258, *3 (N.D.Ill.1996). Thus, the traditional standards for summary judgment still apply even though both parties have moved for summary judgment. *Blum v. Fisher and Fisher,* 961 F.Supp. 1218, 1222 (N.D.Ill.1997). The Court considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration. *Chicago Truck Drivers,* 1996 WL 507258 at *3. This "Janus-like perspective... sometimes forces the denial of both motions," but only where there are material facts in dispute. *Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993).

## IV. Analysis

### A. False advertising under the Lanham Act

■ Plaintiff's claim is premised on § 43(a) of the Lanham Act, which states:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation or fact, which -

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125. To prove a false advertising claim under the Lanham Act, Plaintiff must establish "that the defendant (1) made a false or misleading statement, (2) that actually deceives or is likely to deceive a substantial segment of the advertisement's audience, (2) on a subject material to the decision to purchase the goods, (4) touting goods entering interstate commerce, (5) and that results in actual or probable injury to the plaintiff." *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 971 (7th Cir.1999).

■ The court finds that it would be inappropriate to resolve this case on summary judgment. Defendant's argument for summary judgment in its favor states that "all claims made by the defendant

were true. If the claims are true, then they are not false or misleading. Therefore, the defendant is entitled to judgment as a matter of law." (Dft's Mem. in Support at 4.) Even if there were no disputed facts regarding whether the claims made by Defendant are true, Defendant's statement of the law is incorrect. Section 43(a) "applies with equal force to (1) statements which are literally false and (2) statements which, while literally true or ambiguous, convey a false impression or are misleading in context, as demonstrated by actual consumer confusion." *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir.1992). If Plaintiff demonstrates that the statements at issue are literally false, Plaintiff "need not show that the statement either actually deceived consumers or was likely to do so"; if the statements were not literally false (i.e., were literally true or ambiguous), Plaintiff would be required to show actual consumer confusion. *B. Sanfield*, 168 F.3d at 971; *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir.1994). Thus, Defendant's claims that a literally true statement cannot be misleading is incorrect.

■ The court also finds that there are too many disputed facts for this court to resolve this case by way of summary judgment. The meaning of a given advertisement is a question of fact. *BASF Corp.*, 41 F.3d at 1091; *Abbott Labs.*, 971 F.2d at 13. *See also Hot Wax, Inc. v. Turtle Wax, Inc.*, 27 F.Supp.2d 1043, 1048 (N.D.Ill. 1998) (finding that question of whether a car wax "products—while not meeting the chemical definition of a wax—falsely represent that they have certain qualities that are material to a consumer's decision to purchase the product" should be left to the trier of fact and not resolved on summary judgment). The court finds that Plaintiff has offered sufficient evidence that Defendant's claims are literally false to go to the jury. The expert report of Duerr indicates that the chemical tests that he performed showed that the subject products contained no wax. The expert report of Keller indicates that the claimed benefits of the subject products are untrue. There is also a lack of evidence tending to show that the subject products do include wax or do cover and protect an automobile in the manner claimed by Defendant. This evidence is sufficient for a reasonable jury to find that Defendant's claims are literally false. The court also finds that a reasonable jury could find that Defendant's claims, if true or ambiguous, are misleading because small amount of wax in the subject products (with the largest amount estimated being 1.3%, assuming that the Carnauba Spray 200 is 10% carnauba wax), the fact that the wax that is allegedly found in the Carnauba Spray 200 is alkoxylated, and the lack of proof that the subject products cover and protect an automobile in the manner claimed by Defendant. The Narins survey indicates that consumers expect that the product used in the "wax cycle" to have the effects that Defendant claims its subject products provide. A reasonable jury, considering the Narins survey in tandem with Keller's opinion that the subject products do not have the claimed effects, could find that Defendant's claims, even if literally true or ambiguous are misleading. Accordingly, Defendant's motion for summary judgment is DENIED.

Turning next to Plaintiff's motion, the court again finds that summary judgment is inappropriate. First, Defendant has offered evidence attacking the expert opinions of Duerr and Keller. Defendant's witness Rufner has testified that Duerr's methodology was flawed and failed to separate out nonvolatiles other than wax which may have skewed the spectrum results. Bucher testified that Defendant conducts subjective "field tests" showing that the subject products do provide the claimed effects of protection, shine, etc. This evidence provides a basis on which a reasonable jury could find that Plaintiff has failed to meet its burden of showing that Defendant's statements are either false or misleading. Plaintiff's motion for

partial summary judgment is, therefore, DENIED.

## B. Statute of limitations

█ Defendant seeks to limit Plaintiff's claims to events that occurred within the three years prior to Plaintiff filing its complaint.[7] Section 43 does not establish a statute of limitations. Therefore, this court should apply the most analogous state limitations period. *Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985). The most analogous Illinois limitations period is the three year statute of limitations found in the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a(e). *See H & R Indus., Inc. v. Kirshner,* 899 F.Supp. 995, 1001 (E.D.N.Y. 1995) (applying New York fraud statute of limitations to Lanham Act false designation of origin claim). Because Plaintiff filed this lawsuit on October 1, 1997, application of the three-year statute of limitations would limit its claims to those acts that occurred on or after October 1, 1994.

█ Plaintiff argues that its claims premised on acts that occurred prior to October 1, 1994 should be permitted under the continuing wrong doctrine. Under the continuing wrong doctrine, "only the last infringing act need be within the statutory period." *Taylor v. Meirick,* 712 F.2d 1112, 1119 (7th Cir.1983). The Seventh Circuit has held that the continuing wrong doctrine applies to Lanham Act claims. *Id.* However, the Seventh Circuit has also held that "the fact that a series of . . . unlawful acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts in the series only if their character was not apparent when they were committed but became so when viewed in the light of the later acts." *Moskowitz v. Trustees of Purdue Univ.,* 5

F.3d 279, 282 (7th Cir.1993). Thus, for Plaintiff to recover for the acts that occurred prior to October 1, 1994, Plaintiff must demonstrate that it was unreasonable for it to sue separately for each violation, that, despite its due diligence, it neither knew nor had reason to know of the wrongful acts, or that it "had no reason to attribute an injury to an unlawful act until after a series of similar occurrences revealed their wrongful character." *Forster Music Publisher, Inc. v. Price Stern Sloan, Inc.,* 1995 WL 239093, *3 (N.D.Ill. 1995). Plaintiff has not made any such demonstration. Beyond stating in its complaint that Defendant's wrongful acts began in the 1970's, (Cpt.¶ 6), Plaintiff has made no showing of the timing in this case. In particular, Plaintiff has not stated when it uncovered Defendant's alleged wrongful acts or discovered the allegedly wrongful nature of those acts. In the absence of such evidence, the court finds that the statute of limitations bars Plaintiff's claims for acts that occurred prior to October 1, 1994.

## C. Vicarious liability

Defendant proffered statements regarding the fact that it sells to distributors, not to consumers; Defendant made no arguments regarding the legal impact of those factual statements. Plaintiff has responded by arguing that vicarious liability is permissible under certain circumstances under the Lanham Act. *See Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 853–54, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982) ("[L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally

---

**7.** Defendant did not proffer a motion on the statute of limitations but, instead, raised the statute of limitations argument in its Answer, (*See* Ans., Aff. Def. 2), and in its Responsive Memorandum to Plaintiff's Motion for Partial Summary Judgment. Plaintiff had ample opportunity to respond to the statute of limitations argument in its Reply Memorandum.

induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit."); *Letica Corp. v. Sweetheart Cup Co.,* 805 F.Supp. 482, 488 (E.D.Mich.1992) ("A manufacturer who produces a product bearing a trade dress confusingly similar to a complaining witness' trade dress is liable for placing in the hands of a retailer or wholesaler an instrument of consumer deception."). Here, Plaintiff argues that Defendant's advertising misleads car wash owners and operators into purchasing the subject products for use in the "wax cycle" of the car wash and claims that the use of the subject products in the "wax cycles" misleads consumers, who expect that the products used in the "wax cycles" will contain wax and impart the benefits of wax. If Plaintiff establishes these facts, the vicarious liability theory may be viable.[8]

### V. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment and Plaintiff's motion for partial summary judgment are both DENIED. Plaintiff's motion to strike portions of Bucher's Affidavit is GRANTED. Plaintiff's motion to strike portions of Rufner's testimony is GRANTED IN PART and DENIED IN PART. The court also concludes that Plaintiff's claims for acts that occurred prior to October 1, 1994 are barred.

---

8. The court also notes that the elements of the Lanham Act require that the false advertising be actually or likely deceptive to "a substantial segment of the advertisement's audience." *B. Sanfield,* 168 F.3d 967, 971. This element does not necessarily require that the *end user* be confused; here, the target audience were distributors. While "actual consumer confusion" is required where the statement is not literally false, *id.,* it is unclear whether that means that the *end user* must be confused, nor is it clear that that element cannot be met by misleading a middleman, who then (in its confusion) misleads the end user.