CHATTANOGA MANUFACTURING, INC., Plaintiff,

v.

NIKE, INC., Michael Jordan, an individual, and Does 1–10, Defendants.

No. 99 C 7043.

United States District Court, N.D. Illinois, Eastern Division.

March 16, 2001.

John L. Leonard, Timothy J. Riordan, Michael Howard Erdman, Defrees & Fiske, Chicago, IL, Himanshu R. Sharma, Kenneth F. McCallion, Goodkind, Labaton, Rudoff & Sucharow, Nancy Meridith Dodderidge, Anthony F. LoCicero, Amster, Rothstein & Ebenstein, New York, NY, Robert I. Goodman, Attorney at Law, Ryebrook, NY, for Chattanoga Manufacturing Inc., plaintiffs.

Charles Robert McKirdy, Keith William Medansky, Alan S. Dalinka, Piper, Marbury, Rudnick & Wolfe, Frederick J. Sperling, Clay A. Tillack, Adam S. Weiss, Schiff, Hardin & Waite, Chicago, IL, for Nike, Inc., Michael Jordan, an individual, Does, 1 through 10, defendants.

## MEMORANDUM OPINION
## AND ORDER

CASTILLO, District Judge.

Chattanoga Manufacturing, Inc. sued Nike, Inc., Michael Jordan, and Does 1–10,[1] alleging: (1) trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114(1); (2) unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) common law trademark infringement and unfair competition; and (4) violation of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2. Nike filed counterclaims alleging that Chattanoga's JORDAN trademark was improperly granted by the United States Patent and Trademark Office ("PTO") and should be canceled because: (1) Chattanoga's JORDAN trademark is primarily merely a surname without secondary meaning; (2) at the time Chattanoga applied to register its mark, the term had already acquired secondary meaning and was identified with Michael Jordan and/or products associated with him; and (3) at the time Chattanoga applied to register its mark, it had not been using the trademark in connection with all the goods it described in its application for trademark registration. Plaintiff filed a motion for partial summary judgment against Nike and Jordan ("Defendants"). Defendants also filed a motion for summary judgment as to all of Plaintiff's claims and, in addition, ask for summary judgment on Counts II and III of their counterclaims. For the reasons stated below, we grant Defendants' motion for summary judgment on all of Plaintiff's claims. We deny Plaintiff's motion for partial summary judgment against Defendants. Finally, we deny Defendants' motion for summary judgment on counts II and III of its counterclaims as moot.

## RELEVANT FACTS[2]

### I. Chattanoga Manufacturing, Inc.

In 1979, Morris Moinian and Jimmy Soufian founded Chattanoga and its Jordan Blouse Division. The purpose of Chattanoga and its Jordan Blouse Division has been to manufacture women's blouses and related items. Since 1979, Chattanoga has sold only women's apparel. Initially coined by Mr. Moinian, Chattanoga claims that it has continuously used the term JORDAN to identify the products of its Jordan Blouse Division. Defendants disagree that Chattanoga has continuously used the JORDAN mark and point out that Chattanoga has used various labels other than JORDAN on its products. (R. 62, Defs.' Resp. to Pl.'s 56.1(a)(3) Statement of Facts ¶ 8.) In addition, Chattanoga uses a flower symbol on its "hand tags, bags and some of its letterhead," but Chattanoga claims that it does not consider the flower symbol to be a logo and that it is not intended to identify products with Chattanoga. (R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶ 51.)

In 1997, Chattanoga retained trademark counsel and applied for trademark registration for JORDAN for use on "women's wearing apparel, namely blouses, sweaters, tee shirts[,] jackets, vests, pants, trousers, skirts, suits, dresses, jumpers, jump suits, jogging suits, exercise wear and women's underwear." (R. 43, Pl.'s 56.1(a)(3) Statement of Facts ¶ 9; Pl.'s Ex. 20, Pl.'s Trademark Application for JORDAN.) When it applied for registration of the mark JORDAN in 1997, Chattanoga did

---

1. Chattanoga has had ample opportunity during the course of discovery to identify Does 1–10 and has declined to do so. Consequently, we *sua sponte* dismiss Does 1–10 from this lawsuit.

2. The following facts are not in dispute, except where otherwise indicated.

not submit evidence that the mark had become distinctive of the Chattanoga goods in commerce. (R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶ 59.) Chattanoga's first trademark application was rejected by the PTO for two reasons. First, the examining attorney found a likelihood of confusion with another registered mark, J. JORDAN, for "clothing, namely, coats, jackets, pants, skirts, blouses, shirts, sweaters, dresses, and bathrobes," which was, in some cases "identical" to products in Chattanoga's application. (R. 62, Defs.' Resp. to Pl.'s 56.1(a)(3) Statement of Facts ¶ 12 (citing Pl.'s Ex. 21, Denial of First Trademark Application).) In addition, the application was rejected because the examining attorney determined that "[t]he wording 'exercise wear' in the identification of goods [was] unacceptable as indefinite." (*Id.*) Thus, to register the mark, Chattanoga needed to either specify the common commercial name of the clothing items it had originally identified as "exercise wear" or describe the product and its intended uses. (R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶ 62.) In Spring 1998, Chattanoga purchased the rights to use the term J. JORDAN and then filed a second trademark application. The Certificate of Registration was issued in October 1998.[3]

In 1984, Chattanoga's net sales were almost $3.6 million. By 1998, net sales had grown to almost $16 million. Chattanoga sells directly to wholesalers and retailers, who, in turn, market Chattanoga's products to the ultimate consumer. Chattanoga's intended consumer market has, to date, principally been middle class women in the twenty-five to fifty year old age group, and its products are sold at moderate prices. Over the years, Chattanoga developed a sizeable list of domestic and international clients, numbering in the thousands. Chattanoga's women's clothing products are very diverse. Chattanoga does not currently make, sell or distribute men's clothing or any footwear, and has never done so. (*Id.* at ¶ 7.) Chattanoga does not engage in direct advertising and has no advertising budget. Instead, monies are allocated to advertising on an "as needed" basis. (R. 43, Pl.'s 56.1(a)(3) Statement of Facts ¶ 21.)

## II. The Defendants

### A. Nike, Inc.

Nike, established in 1971, is the world's leading sports and fitness company. Nike designs, manufactures and markets high quality footwear, apparel, equipment, and accessory products. Nike sells its products through approximately 19,000 retail accounts in the United States, through its nike.com website and its Nike Town retail stores and through a mix of independent distributors, licensees and subsidiaries in approximately 140 countries around the world.

### B. Michael Jordan

Michael Jordan is a man of extraordinary fame throughout the world. ESPN's "SportsCentury" named Jordan the greatest North American athlete of the 20th Century. Jordan's fame began at least as far back as 1982 when, as a freshman at the University of North Carolina, he hit the game-winning shot in the 1982 NCAA Championship basketball game. In both 1983 and 1984, Jordan was named "College Player of the Year" by *The Sporting News* and was a unanimous selection for First Team All–American. Jordan was a member of the gold medal-winning United

---

**3.** It appears that the PTO never requested evidence of secondary meaning before registering Chattanoga's mark.

States Olympic men's basketball team in 1984. Also in 1984, Jordan joined the NBA's Chicago Bulls and became the NBA Rookie of the Year, an All Star and the Slam Dunk Champion. Jordan won a second Olympic gold medal in 1992. In all, Jordan played twelve full seasons with the Bulls, leading the league in scoring a record ten times and achieving the highest career scoring average of any player in NBA history. Jordan led the Bulls to six NBA championships, winning the regular season MVP award five times and the Finals MVP award six times. During his professional basketball career, Jordan's uniform prominently displayed the name "JORDAN" and, except for a brief use of the number "45," the number "23."

## C. Nike and Jordan's Relationship

Since 1984, Jordan has endorsed and given valuable input into the design of Nike products, and Nike has promoted Jordan in its marketing campaigns. Jordan's first contract with Nike, effective September 1, 1984, was a "Pro Basketball Consultant Contract," which had a term of five years.[4] At the expiration of the first contract, Jordan and Nike entered into a second five-year agreement, effective September 1, 1989, also denoted "Pro Basketball Consultant Contract."[5] Nike and Jordan's current relationship is governed by a "Personal Services and Endorsement Contract" ("Endorsement Contract"), effective September 1, 1994, which has a term of twenty-nine years. Under the Endorsement Contract, Nike, in exchange for its agreement to pay compensation to Jordan, has the right to use Jordan's name and image in connection with a variety of Nike products. Furthermore, under the Endorsement Contract, Jordan has rights of approval, which he may not unreasonably withhold, for proposed trademarks or marketing materials that use an element of the JORDAN endorsement. (R. 65, Pl.'s Resp. to Defs.' 56.1(b)(3)(B) Statement of Additional Facts ¶ 144.) The Endorsement Contract states that Nike is the "sole and absolute owner" of the JORDAN-related marks. (Defs.' Ex. 202, Endorsement Contract ¶ 9A.) Moreover, the Endorsement Contract states that Jordan's "performance of services is as an independent contractor." (R. 65, Pl.'s Resp. to Defs.' 56.1(b)(3)(B) Statement of Additional Facts ¶ 148.) Jordan, his agent David Falk, President of Nike's Jordan Brand Division Larry Miller, and Vice President of Sports Marketing for Nike's Jordan Brand Division Howard White all testified that Jordan is not a Nike officer or a member of the Board of Directors. Furthermore, they each testified that Jordan does not have the authority of an officer or director; he does not have the authority to hire or fire employees nor the authority to approve or disapprove budgets; and he does not have the authority to bind Nike or its Jordan Brand Division. (*Id.* at ¶ 149.)

In the nearly fifteen years that Nike has been manufacturing and distributing Michael Jordan-endorsed products, Nike has sold many millions of dollars of footwear, apparel and accessories, all bearing indicia of Michael Jordan. With the exception of women's athletic shoes sold in 1999, all of the Michael Jordan-endorsed Nike apparel and footwear products have been designed for men, boys and very small children. Nike's target customer for its Michael Jordan-endorsed products generally is an urban male between the ages of eighteen and twenty-five. The majority of all Michael

---

4. The contract was actually entered into between Nike and Jump, Inc., the company Jordan initially used to house his various endorsement contracts.

5. This second contract also was entered into by Nike and Jump, Inc.

Jordan-endorsed apparel is either intended for exercise or designed to have an athletic "feel" to them. According to Nike, this apparel is priced in a premium price range relative to the competition and product type. (R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶ 85.)

In addition to the JORDAN mark, the Jumpman logo has been used continuously on Michael Jordan-endorsed Nike products since 1986. The Jumpman logo is a silhouette of an actual photograph of Michael Jordan in mid-air, about to make a slam dunk. In fact, all Michael Jordan-endorsed Nike products display indicia of Michael Jordan, including the Jumpman logo and one or more of the following: photographs of Michael Jordan, the initials MJ, and/or the number 23, sometimes depicted as "two3." These products are "sold in men's departments, typically with other athletic or athleisure apparel or in a separate 'Nike' department or Nike-operated store such as Nike Town." (R. 50, Defs.' 56.1(a)(3) Statement of Facts ¶ 90.)

## ANALYSIS

### I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the evidence in a

light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir.1998). However, if the evidence is merely colorable, is not significantly probative, or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261, 106 S.Ct. 2505. When both parties seek summary judgment, the court will "look to the burden of proof that each party would bear on an issue of trial; [the court] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### II. Lanham Act Trademark Infringement Claims

To prove a Lanham Act violation of either trademark infringement or unfair competition, Chattanoga must demonstrate that: (1) it owns a valid and legally protectable mark; and (2) Defendants' use of the mark to identify goods or services causes a likelihood of confusion. 15 U.S.C. §§ 1114, 1125(a); *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir.1997).

### A. Ownership of Protectable Trademark

■ Chattanoga first began using the term JORDAN to identify its products in or around 1980. Chattanoga asserts that it has used the trademark continuously for more than twenty years.[6] In October

---

**6.** Defendants dispute that Chattanoga has continuously used the term and, quoting Chattanoga's brief, argue that Chattanoga has "tested different parts of the women's market using various labels, including, among others, 'Jordan Dresses' and 'Jordan Sports' or 'Jordan Sportswear.'" (R. 62, Defs.' Resp. to Pl.'s 56.1(a)(3) Statement of Facts ¶ 8 (quoting R. 42, Pl.'s Mem. Supporting Cross-Mot. for Partial Summ. J. at 5-6).)

1998, Chattanoga obtained federal registration for the mark JORDAN as its exclusive trademark. This federal registration constitutes prima facie evidence of the mark's validity. 15 U.S.C. § 1115(a).

Defendants respond that the presumption of validity is "easily overcome" where descriptive words are used. (R. 61, Defs.' Resp. to Pl.'s Cross–Mot. for Partial Summ. J. at 9 (citing *Shaw–Barton, Inc. v. John Baumgarth Co.*, 313 F.2d 167, 169 (7th Cir.1963).)) In this case, Defendants argue, because Plaintiff's JORDAN mark is a personal name or, possibly, a geographical name, Plaintiff must show evidence of secondary meaning in order to gain protection for its mark. (R. 49, Defs.' Mem. Supporting Mot. for Summ. J. at 21.); *815 Tonawanda St. Corp. v. Fay's Drug Co.*, 842 F.2d 643, 648 (2d Cir.1988) (personal names are generally regarded as descriptive terms which require proof of secondary meaning) (cited in *J.H. Chapman Group, Ltd. v. Chapman*, No. 95 C 7716, 1996 WL 41254, at *4 (N.D.Ill. Jan.31, 1996)). Defendants argue that Plaintiff has failed to meet this evidentiary burden.

■ Chattanoga, on the other hand, points out that, even without submitting evidence of secondary meaning, the PTO registered its trademark. (R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶ 59). Registration of the mark "without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999). Chattanoga asserts that its JORDAN mark qualifies as an arbitrary mark, named after a geographic location, "*i.e.* the country of Jordan, the Jordan river, etc." [7]

(R. 42, Pl.'s Mem. Supporting Cross–Mot. for Partial Summ. J. at 4, 28 (citing Pl.'s Ex. 2, Pl.'s P'ship Certificate).)

■ We cannot say, as a matter of law, that Chattanoga's mark is either primarily a surname or primarily a geographic designation in the perception of the purchasing public. *In re Hutchinson Tech. Inc.*, 852 F.2d 552, 554 (Fed.Cir.1988) ("The test for determining whether a mark is primarily merely a surname is the primary significance of the mark as a whole to the purchasing public."). Defendants argue that either option requires proof of secondary meaning. (R. 49, Defs.' Mem. Supporting Mot. for Summ. J. at 21.) We disagree. While it is true that a geographic mark could be viewed as geographically descriptive, which requires secondary meaning, such a mark could also be suggestive or arbitrary and, thus, protectable without a showing of secondary meaning. *Boden Prods., Inc. v. Doric Foods Corp.*, 552 F.Supp. 493, 496 (N.D.Ill.1982). We cannot determine whether, if the mark is primarily geographic, it is protectable without evidence of secondary meaning. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir.1992) ("district court's classification of a term as 'descriptive' or 'suggestive' is a factual determination"); *G. Heileman Brewing Co. v. Anheuser–Busch*, 873 F.2d 985, 992 (7th Cir.1989) ("The district court's classification of a term on the trademark spectrum is a factual determination . . . ."). *See In re Compagnie Generale Maritime*, 993 F.2d 841, 845 (Fed.Cir.1993) (whether mark is primarily geographically descriptive or deceptively misdescriptive is question of fact).

---

7. Contrary to Chattanoga's statement that "the Patent and Trademark Office found [that] Chattanoga's mark was 'arbitrary,'" we find no evidence that the PTO ever made such a finding. (R. 42, Pl.'s Mem. Supporting Cross–Mot. for Partial Summ. J. at 28.)

■ In addition, even if we could say that, as a matter of law, Chattanoga's JORDAN mark required proof of secondary meaning, there would remain a question of fact as to whether Plaintiff has met its burden in proving secondary meaning. *See Boden Prods.*, 552 F.Supp. at 498 (citing *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 380–81 (7th Cir.1976) ("The issue of whether a mark has become distinctive as representing a particular company's goods is a question of fact.")). Courts consider a variety of factors in determining whether a mark has achieved secondary meaning. "A party seeking to establish secondary meaning may rely on direct evidence of consumer recognition or indirect evidence consisting of sales volume, advertising expenses and other indicia of recognition and promotion of the product in commerce." *Id.* at 498 (citations omitted). Surveys, while helpful, are not necessary to determine whether secondary meaning has attached to the mark. *Health o meter, Inc. v. Terraillon Corp.*, 873 F.Supp. 1160, 1173 (N.D.Ill.1995) (citing *Vaughan Mfg. v. Brikam Int'l Co.*, 814 F.2d 346, 349 (7th Cir.1987)).

In this case, Chattanoga has presented evidence that its net sales in 1984 were almost $3.6 million and that, by 1998, they were almost $16 million. In addition, Chattanoga's customer list numbers over five thousand, and it entertains repeat business from its customers. (R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶ 60 (citing Pl.'s Exs. 41, Customer List, and 42, Sales Receipts).) Chattanoga prominently displays the term JORDAN on its order forms, garments and bills of sale. (*Id.*) Finally, Chattanoga states that its relationship with its retail customers is such that "it has not been necessary for Chattanoga to engage in an ongoing mar-

keting or promotional effort."[8] (*Id.* at ¶ 109.) Keeping in mind the standard of review in considering the cross-motions for summary judgment, we cannot determine, as a matter of law, whether Chattanoga's JORDAN mark requires evidence of secondary meaning and, if so, whether it has, in fact, attained secondary meaning.

## B. Likelihood of Confusion

■ Because we have found a question of fact as to whether Chattanoga's mark is protectable, we must next consider whether there is a likelihood of confusion resulting from Defendants' use of the JORDAN mark. The determination of likelihood of confusion is a finding of fact, and as such, "a motion for summary judgment in trademark infringement cases must be approached with great caution." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993) (reversing grant of summary judgment for defendant because issues of fact existed regarding likelihood of consumer confusion); *Nike, Inc. v. "Just Did It" Enterprises*, 6 F.3d 1225 (7th Cir.1993) (reversing grant of summary judgment for plaintiff where genuine issue of material fact existed as to whether intended parody of manufacturer's trademarks was likely to confuse consumers). Thus, the likelihood of consumer confusion question can only rarely be resolved on a motion for summary judgment. *TY, Inc. v. Publ'ns Int'l, Ltd.*, No. 99 C 5565, 2000 WL 1499449 (N.D.Ill. Oct.6, 2000) (citations omitted). The Seventh Circuit has identified seven factors to be used in analyzing likelihood of confusion:

(1) similarity between the marks in appearance and suggestion;

(2) similarity of the products;

(3) area and manner of concurrent use;

---

8. Chattanoga admits that "this situation ... may be changing as a result of new buyers having come into the marketplace in the last five years who are not as knowledgeable about Chattanoga Jordan as they are with Nike Jordan products." (*Id.*)

(4) degree of care likely to be exercised by consumers;

(5) strength of complainant's mark;

(6) actual confusion; and

(7) intent of defendant "to palm-off his product as that of another."

*AHP,* 1 F.3d at 615.

This list of factors is not exclusive, nor does any one factor end the inquiry. *McGraw–Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1167–68 (7th Cir. 1986). The parties are not required to prevail on each and every factor in order to avoid summary judgment for the opposing party. The weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F.2d 1176, 1187 (7th Cir.1989).

### 1. Similarity of Marks in Appearance and Suggestion

In determining whether there is similarity in the two marks, we must consider the marks "in light of what happens in the marketplace." *Meridian,* 128 F.3d at 1115. Chattanoga's JORDAN and Nike's JORDAN marks are nearly identical, with the exception that Chattanoga's mark has an elongated "J." Nike asserts that its use of the Jumpman logo and other identifying marks such as Michael Jordan's picture and the number 23, used in conjunction with its JORDAN mark, distinguish its mark from Chattanoga's mark. In addition, Nike argues that Chattanoga's use of a flower image on its hang tags also serves to make clear the difference between the two marks. However, because the marks themselves are nearly identical, we cannot say that, as a matter of law, the other markings successfully mitigate the similarity. *See AHP,* 1 F.3d at 617 (court could not foreclose, as a matter of law, an argument that the parties' marks are confusingly similar). Thus, we find that there is a genuine issue of triable fact as to whether consumers are likely to mistakenly believe that there is an association or sponsorship connection between Chattanoga and Nike. *Id.* at 618.

### 2. Similarity of the Products

It is undisputed that Nike and Chattanoga do not currently manufacture and sell the same products. However, "[o]ne of the reasons courts have given for protecting trademark owners against the use of confusingly similar marks on closely related products is to protect the owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." *Sands,* 978 F.2d at 958. Nike business plans developed in 1998—1999, show that, at that time, "the Jordan Brand Division was considering future products for the women's and girl's footwear and apparel markets." (R. 62, Defs.' Resp. to Pl.'s 56.1(a)(3) Statement of Facts ¶ 37.) Although the "brief experiment" with products aimed at women was discontinued and Nike states that its Jordan Brand Division has no plans to enter the women's footwear or apparel market, none of Nike's market plans establish that its earlier stated goal to move into the women's area has, in fact, been abandoned. (*Id.* at ¶ 75.) Chattanoga also claims that it has a "long-standing interest in moving into related markets, *i.e.* children's wear, clothing for younger consumers, clothing with as [sic] unisex look, even mens wear [sic], etc." (R. 42, Pl.'s Mem. Supporting Cross–Mot. for Partial Summ. J. at 35.) Defendants, however, point out that there is no evidence to support such a contention and that a number of executives, as well as Chattanoga's Head Designer, did not know of any such initiative to enter into the unisex or men's wear market. (R. 61, Defs.' Resp. to Pl.'s Cross–Mot. for Partial

Summ. J. at 26.) Because Chattanoga does not provide any evidence to support its bald assertion that it is seriously contemplating expanding into other markets, we need not consider Chattanoga's alleged product line expansion in analyzing this likelihood of confusion factor. In any case, because there is a question of fact as to whether the products (current and future) are similar, we will not decide this question on summary judgment.

### 3. Area and Manner of Concurrent Use

This factor requires the Court to consider "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties." *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F.Supp. 991, 1001 (N.D.Ill.1997) (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)). Chattanoga sells its products directly to wholesalers and retailers, which, in turn, market Chattanoga's products under the JORDAN label directly to the ultimate consumer. (R. 43, Pl.'s 56.1(a)(3) Statement of Facts ¶ 20). Sales, for the most part, are concentrated in or around market weeks, which occur three to six times a year. Chattanoga has a showroom in New York where, in seasonal market weeks, it displays its goods to the trade. (R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶ 15.) Chattanoga does no direct advertising of its JORDAN products to consumers, has no advertising budget and does not engage in ongoing promotional or marketing efforts with retailers. (*Id.* at ¶ 17.) Chattanoga's women's apparel is usually sold in women's departments. (*Id.* at ¶ 19.)

Nike's Michael Jordan-endorsed products, on the other hand, are sold through retail stores, its nike.com website and its Nike Town retail stores and through a mix of independent distributors, licensees and subsidiaries in approximately 140 countries around the world. (R. 50, Defs.' 56.1(a)(3) Statement of Facts ¶ 24.) Over the past fifteen years, Nike has spent millions of dollars each year advertising these products directly to consumers through television and other media. (*Id.* at ¶¶ 79–80.) Nike's Michael Jordan-endorsed products are sold in men's departments, typically with other athletic or athleisure apparel or in a separate "Nike" department or Nike-operated store such as Nike Town. (*Id.* at ¶ 90.)

Chattanoga asserts that because, in some cases, the parties sell through the same retail department stores and because they both sell nationally, this factor weighs in favor of a finding of likelihood of confusion. We disagree. First, Chattanoga does not dispute the fact that even where the parties' products are sold in the same store, they are generally located in different departments. (*See* R. 56, Pl.'s Resp. to Defs.' Mot. for Summ. J. at 22.) Chattanoga's products are usually sold in women's departments, whereas Nike's Michael Jordan-endorsed products are sold in men's departments. *See S Indus., Inc. v. JL Audio, Inc.*, 29 F.Supp.2d 878, 891–92 (N.D.Ill.1998) (citing *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960 (2d Cir.1981) (courts may consider "whether the products are sold in the same section of a given store" in evaluating the area and manner of concurrent use factor)). Furthermore, the mere fact that both companies have nationwide distribution, given that they generally have different marketing channels and entirely different methods of promotion, does little to tilt this factor in Chattanoga's favor. Thus, we find that this factor weighs against a likelihood of confusion.[9]

9. As mentioned above, Chattanoga claims that it may be expanding into the men's wear

### 4. Degree of Care Likely to be Exercised by Consumers

Nike asserts that clothing, the product at issue in this case, is the type of item that consumers typically inspect and try on before they buy. In response, Chattanoga argues that the products, themselves, are not so sophisticated that the ultimate consumer would necessarily discern that the products come from different sources. Nike next contends that, because its Michael Jordan-endorsed apparel is in a premium price range relative to its competitors, consumers are likely to exercise greater care in making purchasing decisions. Nike also points out that, because of the price differential between Nike's Michael Jordan-endorsed products and Chattanoga's products, consumers are unlikely to be confused. The only products that Nike compares, however, are a Chattanoga pullover retailing for $29.99 and a Nike pullover retailing for $45.00. The parties disagree as to whether the price differential between the two products is significant, and we find that we cannot draw any conclusions from this single data point. *See Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d at 1230 (finding "we cannot agree that as a matter of law customers routinely purchase a $39.95 item without looking carefully at the product information"). We decline to make a factual determination on this element of the likelihood of confusion analysis.

### 5. Strength of Complainant's Mark

The Seventh Circuit has explained that "[i]n a reverse confusion case, ... it may make more sense to consider the strength of the mark in terms of its association with the junior user's goods." *Sands*, 978 F.2d 947; *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency*, 214 F.3d 432, 444 (3d Cir.2000) ("when applying the strength of mark factor, the lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion"); *TV Land, L.P. v. Viacom Int'l, Inc.*, 908 F.Supp. 543, 553 (N.D.Ill. 1995) (in reverse confusion case, court "consider[ed] strength of mark in terms of its association with the Defendants' goods"). Consequently, the Court should examine the strength of the junior user's mark.

The parties agree that Nike's JORDAN mark is strong. Over the last fifteen years, Nike has spent millions of dollars each year to promote its Michael Jordan-endorsed line of products and has sold many millions of dollars worth of these products. (R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶¶ 78–79.) The parties do not dispute that the media and the public have come to identify the name JORDAN with Nike's Michael Jordan-endorsed products. (Defs.' Ex. 11, Pl.'s Am. Resp. to Nike, Inc.'s First Requests for Admission at No. 4.) Thus, because Nike's JORDAN mark is strong, this factor weighs in favor of Chattanoga.[10]

market, and that this favors a finding of likelihood of confusion. However, because Chattanoga has failed to provide evidence of this contemplated expansion, we need not consider it. Even if we were to consider Chattanoga's potential expansion into the men's wear market, that evidence would not change our finding that this factor weighs against a likelihood of confusion.

10. Nike urges us to consider the strength of Chattanoga's mark because, to do otherwise, would work "a perverse result," *i.e.* "less

imaginative marks (*i.e.* "Jordan") would be more likely to win reverse confusion claims than arbitrary or fanciful marks (*e.g.* KODAK)." (R. 70, Defs.' Reply at 10.) To address this potential anomalous result, the Third Circuit considers both a mark's commercial and conceptual strength. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 230–32 (3d Cir.2000). Specifically, a plaintiff with a commercially weak mark is more likely to prevail on a reverse confusion claim than a plaintiff with a

### 6. Actual Confusion

#### a. Survey Evidence

Both Plaintiff and Defendants proffered consumer surveys to address the issue of actual confusion in this case. Both parties argue that the other's survey is flawed. Specifically, Defendants claim that: (1) Chattanoga's survey was not a test of reverse confusion; (2) the survey erroneously included men; (3) the sample size of each of the cells was too small to yield reliable results; (4) the survey had a built-in bias because no effort was made to replicate point of sale circumstances; (5) the survey relied upon guesswork; (6) the survey results are not reliable; (7) there were defects in the set up. of the control cell; and (8) the survey results are not significant. (R. 61, Defs.' Resp. to Pl.'s Cross–Mot. for Partial Summ. J. at 33–42.) We believe that Defendants have raised some valid questions about the probative value of Chattanoga's survey. For example, at least one court in our district has concluded that a survey is flawed where it tests for forward confusion instead of reverse confusion. *R.J. Corr Naturals, Inc. v. Coca–Cola Co.*, No. 97 C 1059, 1997 WL 223058, at *5 (N.D.Ill. April 29, 1997) (Leinenweber, J.). In addition, we agree that the inclusion of men in the survey

pool may have been an error. In a reverse confusion case, "it is appropriate to survey the senior user's customers." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir.1994) (citations omitted); *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 322 (S.D.N.Y.2000) (same). In this case, although Chattanoga suggests that it is considering expanding into men's wear and unisex apparel, none of its evidence supports such a conclusion. Thus, the proper universe to survey would have been women.[11]

Chattanoga, likewise, points out defects in the survey that Defendants commissioned. Specifically, Chattanoga claims that the Defendants' survey: (1) did not use control groups to screen out guessing; (2) asked for the respondent's "knowledge," rather than belief, in certain key questions, which "loaded the dice against a finding of confusion"; and (3) did not ask "permission questions." (R. 56, Pl.'s Resp. to Defs.' Mot. for Summ. J. at 9–11 .) First, regarding the lack of control groups, we are unable to quantify what difference this putative error would have had on the survey results, and Defendants did not address this issue in their reply brief. A control group is generally used to eliminate "general background noise" from the results of the survey. 5 McCarthy on

---

stronger mark. On the other hand, a conceptually strong mark weighs in the plaintiff's favor. We believe that this two-prong approach to the strength of mark determination would adequately address Nike's concern of "perverse results" and, in fact, mirrors Defendants' own proposal to consider the strength of the junior user's mark in considering advertising and promotion but to measure the conceptual strength of the senior user. (R. 61, Defs.' Resp. to Pl.'s Cross–Mot. for Partial Summ. J. at 29; R. 70, Defs.' Reply at 10.) In this case, however, even if we applied the test outlined in *A & H Sportswear*, it would not yield a clear result in either party's favor because the Chattanoga mark is conceptually weak but Nike's mark is commercially strong, and a fact question would remain.

**11.** On February 13, 2001, Chattanoga filed the declaration of Walter McCullough, the person it hired to perform its consumer survey, attempting to address the alleged errors that Defendants found with Chattanoga's survey methodology. Defendants argue that this declaration should be excluded because it was not timely filed under Fed.R.Civ.P. 26(a)(2)(C). In this case, because the unrefuted fact that the survey did not test for reverse confusion, alone, is enough to raise serious questions about the validity of the survey, at this point, we need not consider whether this late-filed declaration is admissible. (*See* R. 56, Pl.'s Resp. to Defs.' Mot. for Summ. J. at 8 (admitting that Chattanoga's survey did not specifically focus on the issue of reverse confusion).)

Trademarks and Unfair Competition § 32:187 (4th ed.1996). In this case, however, Defendants' survey only shows a negligible amount of confusion, and eliminating background noise possibly would only serve to further reduce the percentage of respondents who exhibited confusion. In addition, while we are uncertain of the effect of asking respondents about their "knowledge," instead of their "belief," we need not decide this issue on summary judgment.[12] In this case, Defendants' survey seems to be a more reliable reverse confusion survey than that of Plaintiff's.

### b. Anecdotal Evidence

Chattanoga has admitted that from 1980 to 1995, it did not encounter any consumer confusion between its products and Nike's Jordan products. It did, however, submit more recent anecdotal evidence of actual confusion. First, Chattanoga points to its aborted effort to market tee shirts on which were prominently placed its JORDAN trademark as well as a picture of a basketball player. (R. 42, Pl.'s Mem. Supporting Cross–Mot. for Partial Summ. J. at 9.) The effort was implemented through Kidco Corp., Ltd., a children's wear manufacturer. The plan was abandoned when a sales representative of Kidco was advised by a buyer from Sears, one of Kidco's major customers, that Sears would not purchase such tee shirts because it feared a lawsuit by Michael Jordan Enterprises as well as confusion on the part of its customers between those products and similar looking products offered for sale by Nike. (R. 61, Defs.' Resp. to Pl.'s Cross–Mot. for Partial Summ. J. at 31 (citing Pl.'s Ex. 50, Michael Borowik Letter to Moinian).) In addition, as another example of actual confusion, Chattanoga relates a story about a customer who walked into a Jordan Blouse showroom, located in the Bahamas, in search of products made by Michael Jordan. The incident was memorialized in a hand-written memorandum, dated April 15, 1999, supplied by one of Jordan Blouse's sales representatives, Loretta DeRose.[13]

Defendants respond that the first anecdote, *i.e.* the aborted attempt to sell JORDAN tee shirts to Sears, was apparently a product of Moinian's willingness to pass-off Chattanoga's garments as endorsed by Michael Jordan. We need not decide whether Chattanoga deliberately tried to pass off its garments as Nike's because, as Defendants point out, Sears was not confused as to the *source* of the Chattanoga samples, and its concern about its customers was mere speculation.

Regarding the second incident, Defendants attack the handwritten note memorializing an incident of confusion in the Bahamas showroom as inadmissible hearsay. Caselaw shows, however, that "[s]tatements regarding the state of mind of a declarant, here the unknown [customer],

**12.** Chattanoga's final complaint with Defendants' survey, *i.e.* that it does not ask "permission questions" is undermined both by the fact that its own survey did not include such questions and by McCullough's deposition testimony that some courts consider such questions improper because they involve legal conclusions.

**13.** Chattanoga includes a third example of actual confusion in its motion for summary judgment, *i.e.* Soufian unsuccessfully sought to market tee shirts bearing the JORDAN trademark through an independent joint venture. The expectation was that the joint venture would license the use of Chattanoga's JORDAN trademark. Chattanoga explains that this initiative, however, has been unsuccessful to date. Chattanoga seems to have abandoned its reliance on this third piece of anecdotal evidence. In its response to Defendants' motion for summary judgment as well as in its reply, Chattanoga proffers only the other two incidents as evidence of actual confusion. In any case, the incident does not evince actual confusion, and we need not consider it.

are generally admissible in the Seventh Circuit under these circumstances." *Rock–A–Bye Baby, Inc. v. Dex Prods., Inc.*, 867 F.Supp. 703, 709 (N.D.Ill.1994); *Int'l Kennel Club Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir.1988) (holding that testimony of employees who had received letters, calls and comments expressing confusion between two similarly named parties in that lawsuit was admissible and probative of the existence of a likelihood of confusion). Although admissible, the statement written by the Jordan Blouse sales representative is not entitled to great weight. The statement documents only a single instance of confusion, which occurred outside the United States. Thus, Chattanoga's evidence of actual confusion is slight. *See Rock–A–Bye Baby,* 867 F.Supp. at 709. This factor in the likelihood of confusion determination weighs in favor of Defendants.

### 7. Intent of Defendant "To Palm–Off His Product as that of Another"

As both parties have agreed, this factor is irrelevant in a reverse confusion case, and we will not consider it. *Sands,* 978 F.2d at 960.

### C. Conclusion: Likelihood of Confusion

Questions of fact preclude a decision on summary judgment as to whether there is a likelihood of confusion. That is not, however, the end of the inquiry, as we must address the additional arguments on which Defendants base their motion for summary judgment: (1) laches; (2) dual use; and (3) invalidity of Chattanoga's JORDAN trademark.

## III. Defenses

### A. Laches

■ The equitable doctrine of laches is derived from the maxim that those who sleep on their rights, lose them. The de-

fense of laches, if proven, would bar all of Chattanoga's claims in this case. To prove laches, Defendants must demonstrate: "(1) an unreasonable lack of diligence by [Chattanoga] and (2) prejudice arising therefrom." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir.1999). Courts have consistently recognized that "[e]ven if the elements of laches are established, however, a court need not bar a plaintiff's suit. The application of the laches defense is discretionary, and as an equitable matter, the district court is to look to all the facts and circumstances of the case and weigh the equities of the parties." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 27 F.Supp.2d 1043, 1048 (N.D.Ill.1998), *aff'd,* 191 F.3d 813 (7th Cir.1999); *Gossen Corp. v. Marley Mouldings, Inc.*, 977 F.Supp. 1346, 1350 (W.D.Wis.1997) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed.Cir.1992) (en banc) ("where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied")).

In this case, the evidence unequivocally demonstrates an unreasonable lack of diligence on Chattanoga's part. First, it is undisputed that Nike very publicly advertised its Michael Jordan-endorsed products, highlighting the association between the man and the products since 1985. (R. 49, Defs.' Mem. Supporting Mot. for Summ. J. at 27; R. 57, Pl.'s Resp. to Defs.' 56.1(a)(3) Statement of Facts ¶¶ 75, 77–80.) Nike has produced and used numerous television advertisements involving Michael Jordan and Michael Jordan-endorsed Nike products, which have been referred to as "Jordan" products for years. One would have to have lived a hermitic existence not to be aware of these Jordan products during this time period. In fact, Chattanoga admits that "since at least 1990, the media in the United States have referred to products identified or associat-

ed with Defendant Michael Jordan, including products manufactured, sold and/or distributed by NIKE, with the term 'Jordan' ('Jordan' shorts, caps, shoes, etc.)." (Defs.' Ex. 11, Pl.'s Am. Resp. to Nike, Inc.'s First Requests for Admission at No. 4. *See* R. 70, Defs.' Reply at 18.) Based on Chattanoga's knowledge of the media's use of the term JORDAN, it is clear that Chattanoga had a duty to investigate and is, therefore, deemed accountable for what it should have known.[14] *Safeway Stores, Inc. v. Safeway Quality Foods, Inc.,* 433 F.2d 99, 103 (7th Cir.1970) (plaintiff chargeable with information it might have received had due inquiry been made). Yet, despite its awareness of Jordan's growing popularity and the Michael Jordan-endorsed products, as well as the potential effect on its own business interest, Chattanoga inexplicably took no action and did not file its complaint in this case until 1999, nine years after it admittedly knew about the media's use of the term JORDAN in connection with Nike's products. This non-action was unreasonable in light of the undisputed facts surrounding this case.

Chattanoga argues that it was not aware that it had a valid claim against Defendants until recently, perhaps as recently as 1997, when the Jordan Brand Division was established. Chattanoga explains that, within the last few years, it realized the potential appeal of Michael Jordan-endorsed products to women and that Nike's Jordan brand was expanding more aggressively into new markets, including the women's wear market. (*See* R. 66, Pl.'s Reply at 4.) However, as Defendants point out, "it is undisputed that since 1985, Nike has sold Jordan tee shirts, sweatshirts, shorts and the like which, as Chattanoga admitted in discovery, 'could be worn by women.'" (R. 70, Defs.' Reply at 18 n. 14 (citing Defs.' Ex. 6, Pl.'s Resps. to Nike, Inc.'s First Set of Requests for Admission, Resp. No. 35).)

Moreover, although the Lanham Act does not provide a statute of limitations for a federal unfair competition or a trademark infringement claim, federal courts, including those in our circuit, "have referred to analogous state statutes of limitations to determine whether a presumption of laches should apply." *Hot Wax,* 191 F.3d at 821 (citing *Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)) ("When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."); *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191 (2d Cir.1996) (applying analogous statute of limitation in the consideration of a laches defense in a Lanham Act case). The parties have not addressed what the appropriate analogous statute of limitations would be in this case. The case law in this circuit makes clear, however, that the most analogous Illinois limitations period for causes of action under the Lanham Act is the three year statute of limitations found in the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a(e). *Hot Wax, Inc. v. Warsaw Chem. Co., Inc.,* 45 F.Supp.2d 635, 647 (N.D.Ill.1999); *Kitchen Connection, Inc. v. Pampered Chef, Ltd.,* No. 98 C 4321, 1999 WL 1101231 (N.D.Ill.Dec.1, 1999); *Zenith Elecs. Corp. v. Exzec, Inc.,* No. 93 C 5041, 1997 WL 798907 (N.D.Ill.Dec.24, 1997).[15]

---

**14.** Chattanoga makes a feeble and unsuccessful argument that only *"sports media"* used the term JORDAN to refer to Michael Jordan-endorsed Nike products. Defendants' unrefuted evidence amply demonstrates that the mainstream media widely used the term in this manner. (*See* Defs.' Ex. 100, NEXIS Search Results.)

**15.** While these cases all addressed the question of which statute of limitations would be

The chief purpose of statute of limitations periods is to require parties to take action rather than sit on their potential claims. This requirement of action ensures that disputes are uncovered early enough to be easily resolved through settlement or court adjudication without any prejudice to either side. In this case, where Chattanoga's delay of nine years is three times longer than the analogous statute of limitations period, there is a strong presumption of laches.

In addition to unreasonable lack of diligence, we also must consider whether there has been prejudice to Defendants. The undisputed evidence clearly demonstrates that Defendants would be prejudiced if we allowed Chattanoga to continue to press its lawsuit. Over the past fifteen years, Nike has spent millions of dollars each year to promote its Michael Jordan-endorsed products and to pay royalties to Jordan. Nike has invested substantial funds in promoting its products as JORDAN products. In doing so, Nike has acquired a position as a market leader. Had Chattanoga brought this action in a more timely manner, Defendants "might well have chosen some alternative position which it believed to best promote its chosen image." *Conopco*, 95 F.3d at 193 (cited in *Hot Wax*, 27 F.Supp.2d at 1048).

Instead, the undisputed facts establish that Chattanoga did virtually nothing in the face of the growing popularity of the Michael Jordan-endorsed Nike products in this country, which was fed by Jordan's spectacular basketball success. Chattanoga sat idly by—permitting Nike's advertising and development of its products to go unchecked for a period of at least nine years—and chose not to challenge Nike's use of the term JORDAN with respect to its products. Indeed, Chattanoga's first effort to protect its mark against Defendants' very public use of the mark on its own products was to belatedly file an application for trademark registration in 1997. Even after taking this step, Chattanoga did not attempt to contact Defendants to make them aware of its claimed superior rights until just before it filed this lawsuit, in October 1999. We easily conclude that forcing Nike to abandon its name now, after fifteen years of unchallenged promotion and expansion, would result in extreme prejudice to Defendants. The doctrine of laches is to be applied by the Court in its discretion and in light of all the facts. *See Hot Wax*, 27 F.Supp.2d at 1048. We find that in light of all of the facts, the extensive delay involved, the absence of any evidence of Defendants' bad faith and the extreme prejudice to Defendants, laches is warranted.[16]

Finally, in this case, due to Chattanoga's long delay and the extreme prejudice to Defendants, we must deny both damages and injunctive relief to Chattanoga. *Hot Wax*, 191 F.3d at 822 (affirming district court's decision to bar both equitable relief and damages where facts warranted a complete denial of relief); *Conopco*, 95 F.3d 187 (2d Cir.1996) (affirming trial court's decision to deny plaintiff's request for an injunction where defendant demonstrated laches); *Seven–Up Co. v. O–*

---

analogous to claims under § 43 of the Lanham Act, we believe that the same Illinois statute also is analogous to claims under § 32. Both §§ 32 and 43 require proof of: (1) ownership of a valid trademark; and (2) a likelihood of confusion.

**16.** Defendants have alleged that Chattanoga regularly infringes the intellectual property rights of third parties. (R. 61, Defs.' Resp. to Pl.'s Cross–Mot. for Partial Summ. J. at 31 n. 23 ("Chattanoga regularly uses famous names and marks to describe products without permission or authority to do so.").) While we need not decide this matter, such a showing, as an equitable matter, would also weigh in favor of granting summary judgment to Defendants on their laches defense.

So–Grape Co., 283 F.2d 103, 106 (7th Cir. 1960) (quoted in Hot Wax, 27 F.Supp.2d. at 1053) (plaintiff's "delay may be so prolonged and inexcusable that it would be inequitable to permit plaintiff to seek injunctive relief as to future activities"). To do otherwise would be to work an extreme injustice to Defendants and to reward Chattanoga for sleeping on its rights. See Hot Wax, 191 F.3d at 823 (citing Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 498 (2d Cir.1961) ("[I]t cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished.")). Thus, we grant summary judgment in favor of Defendants on the laches defense. Given our conclusion on laches, we see no reason to address the other defenses.[17]

### CONCLUSION

For the foregoing reasons, we grant Defendants' motions for summary judgment on all Plaintiff's claims. (R. 46–1 and 47–1.) We deny Plaintiff's motion for partial summary judgment against Defendants. (R. 41–1.) Finally, we deny Defendants' motion for summary judgment on counts II and III of its counterclaims as moot. (R. 48–1.) We instruct the Clerk of Court

to enter judgment accordingly pursuant to Fed.R.Civ.P. 58.

---

**17.** We note that, even if laches did not apply in this case, Chattanoga's claims against Michael Jordan, individually, would not withstand summary judgment. Under the caselaw of this circuit, even if Chattanoga could demonstrate that Jordan was an "officer," a fact Jordan and all Nike officers who were deposed as witnesses vehemently deny, he would not bear personal liability in the absence of "some special showing" of his culpability. Dangler v. Imperial Mach. Co., 11 F.2d 945 (7th Cir.1926). Specifically, Jordan must have acted willfully and knowingly, i.e., he must have "personally participate[d] in the manufacture or sale of the infringing article (acts other than as an officer)" to be held personally liable. Id. at 947 (emphasis added). See Drink Group, Inc. v. Gulfstream Communications, Inc., 7 F.Supp.2d 1009, 1010 (N.D.Ill.1998) (citations omitted) ("Despite the passage of years, Dangler is still the law of this Circuit and cited approvingly by subsequent courts."). Chattanoga has not been able to establish facts demonstrating such a "special showing."